UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
IRIS VERNETT WHITE,                                     :

                        Plaintiff,                      :          <u>OPINION AND ORDER</u>

    -v.-                                                      :          13 Civ. 6854 (GWG)

CAROLYN W. COLVIN,                                      :
Acting Commissioner of Social Security,
                                    :

                        Defendant.                      :
----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Iris Vernett White brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under the Social Security Act.  White moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and the Commissioner has cross-moved for judgment on the pleadings.[1]  The parties consented to having this matter decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, the Commissioner's motion is denied, White's motion is granted, and the case is remanded for further proceedings.

---

[1]  <u>See</u> Motion for Judgment on the Pleadings, dated Mar. 10, 2014 (Docket # 10); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated Mar. 10, 2014 (Docket # 11) ("Pl. Mem."); Notice of Motion, dated June 23, 2014 (Docket # 19); Memorandum of Law in Support of Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated June 23, 2014 (Docket # 20) ("Def. Mem."); Reply Memorandum in Further Support of Plaintiff's Motion for Judgment on the Pleadings, dated July 7, 2014 (Docket # 21); Reply Memorandum of Law in Further Support of Defendant's Motion for Judgment on the Pleadings, dated July 21, 2014 (Docket # 23).

I.      BACKGROUND

      A.      White's Claim for Benefits and Procedural History

White applied for Social Security Disability benefits and Supplemental Security Income payments on June 28, 2011, alleging that she has been unable to work since January 2010.  See Administrative Record, filed Feb. 4, 2014 (Docket # 8) ("R."), at 103-06, 114-22.  She had previously been employed as a retail makeup artist, R. 139, manager, cashier, and salesperson, R. 151.  White stopped working when she was laid off in September 2009.  R. 38, 113.  As part of her applications, White submitted records from several doctor and hospital visits.  See R. 192-314.  She also underwent an examination by a consultative physician hired by the agency.  See R. 236.

The Social Security Administration ("SSA") denied White's applications.  R. 47, 61. White requested a hearing before an Administrative Law Judge ("ALJ").  R. 68.  The ALJ held a hearing on May 14, 2012.  R. 35-45.  On June 4, 2012, the ALJ found that White was disabled as of April 30, 2012, and was not disabled prior to that date.  R. 20-30.  White submitted new evidence from her doctors to the Appeals Council.  See R. 315-82.  The Appeals Council denied White's request for review on August 12, 2013, making the ALJ's determination the Commissioner's final decision.  R. 3-9.

      B.      Medical Evidence

          1.      Michael Naarendorp, M.D.

On May 19, 2009, Dr. Naarendorp wrote a letter stating that he had examined White and was excusing White from work until June 4, 2009, due to an unspecified illness.  R. 187.  He wrote another letter on June 2, 2009, stating that White needed to be excused from work until June 8, 2009.  R. 308.  On June 11, 2009, White sought treatment from Dr. Naarendorp after she

went to the emergency department complaining of a flare-up of joint and muscle pain.  R. 317.

Dr. Naarendorp diagnosed White with systemic lupus erythematosus ("SLE") and prescribed her

medication, including Plaquenil and Prednisone.  Id.  He also noted that White had asthma in her

medical history.  Id.

     White continued with Dr. Naarendorp for routine follow-ups for SLE between August

2009 and December 2009, during which he examined her and adjusted her medications.  See R.

317-30.  On September 1, 2009, White complained of pain to Dr. Naarendorp but admitted that

she was not taking her medication.  R. 322-23.  Dr. Naarendorp wrote a letter stating White

needed time off from work until September 7, 2009.  R. 242.  On September 28, 2009, White had

no significant complaints.  R. 324-26.  On November 9, 2009, and December 17, 2009, White

reported that she was doing well.  R. 327-30.

     On June 14, 2010, White reported to Dr. Naarendorp that she had fatigue, but fewer

pains.  R. 331-32.  Dr. Naarendorp noted that White was not taking her full dosage of the

medication Plaquenil.  R. 331.  On August 13, 2010, White had a flare-up of her SLE symptoms

after sun exposure.  R. 333-34.  During several visits between August 2010 and January 2011,

Dr. Naarendorp's notes indicate that White's lungs were clear, neurological examination was

non-focal, and there was no clubbing or edema of the extremities.  R. 331-40.

     On March 1, 2012, Dr. Naarendorp noted that White also had pain in the bottom of her

foot, but it was unrelated to the SLE.  R. 342.  On March 16, 2012, and April 24, 2012, Dr.

Naarendorp examined White and noted she was tolerating certain medication well.  R. 344-47.

Dr. Naarendorp also noted White had bilateral pitting edema and an itchy rash over her left

breast.  Id.  On May 10, 2012, White saw Dr. Naarendorp for left hip pain, and he assessed

localized osteoarthritis in the pelvic and thigh region.  R. 348-49.  He noted that White's lungs

3

were clear, neurological examination was non-focal, and there was an itching rash over her left breast.  Id.  He also noted bilateral pitting edema was present. R. 348.  Dr. Naarendorp continued White's medications for SLE.  Id.

      2.     Robert Gibbs, M.D.

On June 30, 2011, White saw Dr. Robert Gibbs.  See R. 368.  He noted her medical history of SLE.  Id.  He noted White had no sensory problems, but that she complained of frequent dizziness and headaches, and occasional dyspnea.  Id.

On July 7, 2011,White saw Dr. Gibbs with hyperpigmented lesions of her legs and hair loss. R. 369.  White continued to see Dr. Gibbs for checkups and refills of her medication on July 21, 2011, August 12, 2011, September 17, 2011, and October 31, 2011.  Id.  On August 12, 2011, Dr. Gibbs noted that White was being treated for hypertension, bronchial asthma, and SLE, and was unable to work at that time. R. 370.  On September 17, 2011, Dr. Gibbs noted White was still having postural problems intermittently. R. 369.  On October 31, 2011, Dr. Gibbs noted White had been recently hospitalized.  Id.

A record from October 2011 indicates that an entity called "Health and Home Care" assigned an aide to assist White with bathing, hygiene and grooming, medication, ambulation and mobility, meal preparation, grocery shopping, and light housekeeping. R. 310.  On November 8, 2011, Dr. Gibbs certified a Medical Request for Home Care for White.  R. 176-79. The form noted the following: White had recently been hospitalized for SLE and numbness, R. 176; lupus had set in her bones and she required a wheelchair or a walker, R. 177; she was unable to walk more than five to ten feet without a walker, R. 179; she required assistance with most activities of daily living, id.; and she had an unsteady gait and weakness and swelling of

her legs, R. 177.  On November 19, 2011, Dr. Gibbs noted that he was treating White for Diabetes Mellitus and SLE, and that White required transportation services.  R. 373.

On December 3, 2011, Dr. Gibbs certified a Home Visit Needed Request Clinician Assessment form.  R. 374.  He noted that White's current medical and mental conditions included SLE, hyperlipidemia, pyrosis, and bronchial asthma.  Id.  The form also noted that these conditions caused White to fatigue easily and affected her ability to travel to appointments, take public transportation, travel outside of her home without a companion, attend appointments, go food shopping, and handle other routine errands.  Id.

On February 2, 2012, Dr. Gibbs examined White and noted bilateral pedal edema. R. 375.  He diagnosed her with SLE and prescribed Lasix, Prednisone, Procardia, and Plaquenil. Id.

Dr. Gibbs examined White on April 1, 2012, and filled out a Multiple Impairment Questionnaire on April 2, 2012.  R. 294-301.  Dr. Gibbs diagnosed White with SLE with a fair prognosis, citing abnormal laboratory blood test results to support his finding.  R. 294-95. White's primary symptoms were numbness and vertigo, but she also complained of daily severe joint and hand pain when she was not taking her medication.  R. 295-96.  He noted that White's fatigue and pain were severe, a 9 on a 10-point scale, but that he has also been able to completely relieve her pain with medication without unacceptable side effects.  R. 296.  Though Dr. Gibbs did not note fatigue as one of White's primary symptoms, R. 295, he completed the form questionnaire to indicate that in an eight hour day, White could not sit for more than one hour at a time and could not stand or walk for more than one hour at a time, R. 296.  Dr. Gibbs noted that it would be necessary or medically recommended for White not to sit continuously while working, and it would be necessary or medically recommended for White not to stand or walk

continuously while working.  R. 296-97.  If White was sitting, she needed to stand up and move around four times per hour.  R. 296.  Dr. Gibbs noted that White could frequently lift up to 10 pounds and occasionally carry up to 10 pounds, but could never lift or carry anything heavier. R. 297.  He noted that White had significant limitations on doing repetitive reaching, handling, fingering, and lifting because of her dizziness and weakness, and that she was significantly limited, but not completely precluded, in grasping, turning, and twisting objects.  Id.  He noted that she was essentially precluded from using her fingertips or hands for fine manipulations and from using her arms for reaching.  R. 298.  Dr. Gibbs believed White's symptoms would likely increase if she was placed in a competitive work environment and that she could not perform a job which required her to keep her neck in a constant position (e.g. looking at a computer screen or down at a desk).  Id.  Dr. Gibbs noted that White's experience of pain, fatigue, and other symptoms were frequently severe enough to interfere with her attention and concentration, and she was incapable of tolerating even low work stress.  R. 299.  White would need to take unscheduled breaks at unpredictable intervals twice per hour, for 20 minutes at a time.  Id. Although White's impairments could have good days and bad days, Dr. Gibbs opined that she would likely need to be absent from work more than three times per month.  R. 300.  He noted that White was also limited in her ability to work at a regular job on a sustained basis because of psychological limitations, the need to avoid wetness, gases, extreme temperatures, humidity, and dust, and because she could not push, pull, kneel, bend, or stoop.  Id.  In Dr. Gibbs's opinion, these descriptions of White's symptoms and limitations applied since January 2011.  Id.  Dr. Gibbs recommended that White undergo physical therapy because of her SLE.  R. 312.

On May 12, 2012, Dr. Gibbs certified a Home Health Certificate and Plan of Care. R. 381-82.  He diagnosed White with SLE and peripheral neuropathy.  R. 381.  He noted that

White had limited endurance and could move as tolerated with use of a cane.  Id.  Dr. Gibbs stated that White needed an aide for four hours a day, five days a week, for nine weeks.  Id.  The aide would help with personal care assistance, food preparation, and light housekeeping.  Id.

On June 5, 2012, the Health and Home Care Agency wrote to Dr. Gibbs to confirm White was receiving home care services.  R. 379.  On June 18, 2012, Dr. Gibbs noted that White was asymptomatic.  R. 375.

3.    <u>Harlem Hospital Center</u>

On May 5, 2010, White was treated for an acute upper respiratory infection as a walk-in patient at the Harlem Hospital Center emergency department.  R. 288-92.  White was noted to be ambulatory, alert, oriented to person, place, and time, and not in acute distress.  R. 288.  On December 19, 2010, White went to Harlem Hospital Center complaining of dizziness the day before and was discharged later that day with instructions to follow up with the medical clinic in one week, or return to the emergency department if the symptoms worsened.  R. 282-87.  At the time, White was ambulatory and alert, and not in any pain.  R. 282, 285.

On June 23, 2011, White was treated at Harlem Hospital Center for extrinsic asthma with acute exacerbation after running out of Albuterol medication.  R. 224-30, 275-81.  White felt fine after receiving Albuterol and was discharged.  R. 226.

On September 12, 2011, White was admitted to Harlem Hospital Center complaining of "left hand and perioral numbness" for the previous three days.  R. 209-23, 231-35, 247-74.  White traveled to the hospital by bus.  R. 247.  White was evaluated by attending physicians Dr. Karina Caraballo, R. 209-217, Dr. Roseanne Cousins, R. 217-18, 222-23, Dr. Abraham Chacko, R. 219-21, Drs. Virginia Thornley and Muhammad Tariq, R. 270-73, and Dr. Muhammad Rizvi, who prepared the discharge summary, R. 254-57.

7

When White met with Dr. Caraballo, she reported numbness around her lips and left hand, and weakness of both knees without loss of sensation.  R. 209.  White also complained of headaches and shortness of breath that worsened with activity.  Id.  White reported her medical history of asthma, hypertension, and SLE.  R. 210.  She reported that she was diagnosed with SLE two years earlier and began to have rashes in her legs and back, and pain in her knees, hip, and wrists.  R. 209.  She reported that she follows up with her primary physician, Dr. Gibbs, regularly, but has not followed up with her rheumatologist, Dr. Naarendorp, for the past year because she did not have insurance.  Id.

When White was referred to Drs. Tariq and Thornley for a neurological consultation, White reported that her SLE was under control with no recent flare-ups.  R. 270.  She also reported that by the time of the consultation, the numbness in her hands was almost gone, and the perioral numbness was much decreased and was only localized to the upper lip.  R. 271.

The doctors generally noted that White was not in acute distress and that she was alert and oriented.  R. 211, 217, 220-21, 271.  White's grip strength was from 4+ to 5 out of 5 in her upper extremities, and from 4 to 5 out of 5 in her lower extremities.  R. 211, 221, 255, 271.  Dr. Chacko found White had decreased sensation to light touch on her left upper extremities.  R. 221.  Drs. Caraballo, Tariq and Thornley, and Rizvi found sensation to pinprick and soft touch to be intact.  R. 211, 255, 272.  Drs. Tariq and Thornley noted that White's gait was unstable, R. 255, 272, but Dr. Chacko and Dr. Caraballo both reported that White's gait was normal, R. 211, 221.  Dr. Caraballo reported White had good air entry and no rales, ronchi, or wheezes.  R. 211-12.  Dr. Chacko reported the same.  R. 221.  Dr. Cousins reported that White's lungs were clear.  R. 217.  Dr. Caraballo noted that White's physical examination was "essentially normal."  R. 213.

8

White was diagnosed with peripheral neuropathy associated with SLE.  R. 213, 215, 217, 254, 257.  At her neurological consultation, an MRI and MRA of the brain were recommended but White refused twice, even after being counseled about the advantages of having such procedures to rule out other causes.  R. 254-55.  A CT Scan of the brain showed no intracranial hemorrhage and no mass or midline shift.  R. 255.

White was discharged to her home without services on September 14, 2011, and was instructed to follow up with her primary care provider.  R. 256.  She was also given an outpatient appointment for a CT scan of her head.  Id.  White's discharge status was "stable," and she was advised to ambulate "ad lib" (that is, at will).  Id.

        4.     Consultative Examination

On August 16, 2011, Dr. Aurelio Salon examined White at the request of the SSA.  R. 236-40.  White's chief complaints were bronchial asthma, SLE, and hypertension.  R. 236. White complained of pain in all of her joints, but mostly in the hips, knees, elbows, feet, and hands, stating that she had the pain for about three years.  Id.  She also reported hair loss, intermittent skin rashes, and headaches.  Id.  She alleged flare-ups of SLE twice per month and asthma attacks once per month.  Id.  Dr. Salon noted that White was diagnosed with hypertension and bronchial asthma and that in the past year White had started to forget things, such as her appointments or taking her medication, but had not been evaluated yet.  Id.  Dr. Salon noted White could do many activities of daily living, such as cooking, cleaning, doing laundry, shopping, showering, and dressing herself.  R. 237.  White also stated that she watched television, listened to the radio, and read.  Id.

During the physical examination, Dr. Salon observed that White needed no help changing for the exam or getting on and off the exam table, and she was able to rise from a chair without

any difficulty.  Id.  At this time, White was 59 inches tall and weighed 186 pounds.  Id.  Dr.

Salon noted that White's blood pressure was 110/80, her gait was normal, and she was not in

acute distress.  Id.  White declined to walk on her heels and toes or do a squat.  Id.  Dr. Salon

noted scars on both extremities and that White was wearing a wig, but she had no active lesions.

Id.  The examination showed mild tenderness of the right knee with flexion, and an extension of

135 degrees.  R. 238.  Dr. Salon noted that White had full range of motion in her shoulders,

elbows, forearms, wrists, hips, ankles, and left knee, and that her other joints were stable and

nontender.  Id.  Dr. Salon found that there was no muscle atrophy evident in her extremities, id.,

White's hand and finger dexterity was intact, and her grip strength was 5/5 bilaterally, R. 239.

Dr. Salon diagnosed White with a history of SLE with current right knee pain, a history

of hypertension, a history of bronchial asthma, a history of short-term memory loss, and obesity.

Id.  Based upon White's medical history and the physical, Dr. Salon concluded that there were

"no objective findings to support the fact that [White] would be restricted in her ability to sit or

in her ability to stand for long periods of time."  Id.  Dr. Salon also concluded that White's

"capacity to climb, push, pull, or carry heavy objects would be currently restricted because of

right knee pain secondary to [SLE]."  Id.  Dr. Salon also cautioned White to avoid smoke, dust,

and other known respiratory irritants because of her history of bronchial asthma.  Id.

C.    Other Evidence

White was born on April 30, 1962.  R. 103.  She has a high school education, R. 139, and

work experience as a retail makeup artist, id., manager, cashier, and salesperson, R. 151.  She

stopped working in September 2009, when she was laid off.  R. 38, 113.

On September 28, 2011, a Social Security employee identified as "C. Ballard" spoke with

White and reported that White was admitted to Harlem Hospital Center and that Dr. Cousins, an

attending physician at the hospital, had ordered a walker for her.  R. 136.  On October 3, 2011,
C. Ballard indicated that she "feel[s] [White] needs a walker."  R. 135.  However, C. Ballard
then spoke with Dr. Cousins, who stated that she had not seen White since September 13, 2011,
that there was no need for a walker nor cane at that time, and that Dr. Cousins had not ordered a
cane or walker for her.  Id.

White also submitted work orders, dated October 27, 2011, October 28, 2011, and
November 15, 2011, which indicate the receipt of a cane, wheelchair, and related wheelchair
accessories.  See R. 123-25.  On January 4, 2012, New York City Transit approved White for
Access-A-Ride paratransit service.  R. 126.

In her disability report filed with her request for an ALJ hearing, White stated that she
could take care of her own personal needs, but at a slower rate of time.  R. 130.

D.    The ALJ Hearing

White testified at the hearing before the ALJ on May 14, 2012.  See R. 35-45.  White
testified that she has pain and discomfort in her feet and legs, R. 38, as well as her back, R. 42.
She also complained of numbness in her hands and feet.  R. 43.  Her medication does not help
with the pain.  R. 38.  Due to SLE, her legs and hands lock, and her body, legs, hands, and feet
swell up.  R. 38-39, 43.  She gets tired very quickly, and uses a walker and support stockings.
R. 38-39.  She can stand for about 10 minutes and can sit for about 30 to 45 minutes at a time.
R. 40.  She can walk two to three blocks, and can lift between zero and five pounds.  Id.  She can
write "a little" and can use the computer keyboard for about five minutes.  R. 42.  She uses a
cane and a walker, even at home, and cannot go anywhere without them.  R. 43.  White's home
health aide does all of her grocery shopping, cooking, and cleaning.  R. 41.

11

White testified that the most comfortable position is lying down, and spends approximately five hours a day lying down.  R. 43.  She attended the May 14, 2012 ALJ hearing using a walker and accompanied by a caretaker.  R. 38.  White used Access-A-Ride to get to the hearing.  R. 41.

E.    The ALJ's Decision

On June 4, 2012, ALJ Michael Friedman issued a decision in which he found that White was "not disabled" prior to April 30, 2012, that she became disabled on that date, and that she remained disabled through the date of the decision.  R. 20-30.  His findings of fact and conclusions of law are as follows:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.
>
> 2.  The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.  Since the alleged onset date of disability, January 5, 2010, the claimant has had the following severe impairments: lupus, asthma, right knee pain, and obesity.  (20 CFR 404.1520(c) and 416.920(c)) . . . .
>
> 4.  Since the alleged onset date of disability, January 5, 2010, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) . . . .
>
> 5.  After careful consideration of the entire record, the undersigned finds that since January 5, 2010, the claimant has had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) . . . .
>
> 6.  Since January 5, 2010, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965) . . . .
>
> 7.  Prior to the established disability onset date, the claimant was a younger individual age 45-49.  On April 30, 2012, the claimant's age

12

category changed to an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Prior to April 30, 2012, transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" whether or not the claimant has transferable job skills.  Beginning on April 30, 2012, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Prior to April 30, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a) . . . .

11.  Beginning on April 30, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966) . . . .

12.  The claimant was not disabled prior to April 30, 2012, but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) . . . .

Id.

In relation to point five above, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment."  R. 28.  The ALJ referred to the findings of Dr. Naarendorp, the Harlem Hospital Center records, Dr. Gibbs, and Dr. Salon, as well as the testimony of White.  R. 27-29. The ALJ found that her statements were inconsistent with the Harlem Hospital Center records

and the findings made by the SSA consultative examiner.  R. 28.  The ALJ gave "some weight" to the opinion of Dr. Gibbs but found that the limitations described by Dr. Gibbs were "not fully supported by the objective findings in the record."  Id.  Specifically, he found that the "claimant's lupus and asthma appear to cause some limitations . . . but not to the degree described by Dr. Gibbs."  Id.  The ALJ gave "[s]ignificant weight" to the findings and opinion of the SSA consultative examiner.  R. 28-29.  After considering the "whole of the evidence," the ALJ found that White appeared to be capable of "performing the full range of sedentary work." R. 29.  The ALJ ultimately concluded that the residual functional capacity assessment was supported by the opinion of the SSA consultative examiner, the hospital records and progress notes, and part of Dr. Gibbs's report and opinion.  Id.

Under point six, the ALJ noted that the "demands of [White's] past relevant work exceed the residual functional capacity."  Id.  Accordingly, he considered whether White was able to perform other work.  The ALJ considered White's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2.  R. 29.  Given his finding that White had the residual functional capacity to perform the full range of sedentary work, the ALJ concluded that, based on her age, education, and work experience, Medical-Vocational Rule 201.21 directed a finding of "not disabled" prior to White's 50th birthday on April 30, 2012.  Id.  On April 30, 2012, however, White's age category changed, and based on White's residual functional capacity, age, education, and work experience, Medical-Vocational Rule 201.14 directed a finding of "disabled" as of that date. R. 30.

II.     APPLICABLE LAW

    A.     Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (citation and internal quotation marks omitted); accord Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

    "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  Brault v. Soc. Sec.

Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would have to conclude otherwise."  Id. (emphasis in original) (citation and

internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and

substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d

at 454 (citations and internal quotation marks omitted).

      B.      Standard Governing Evaluations of Disability Claims by the Agency

      The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy."  Id. § 423(d)(2)(A).

      To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

      Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must use in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4); see

also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must

determine whether the claimant is currently engaged in any "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity,

the Commissioner must decide if the claimant has a "severe medically determinable physical or

mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of

impairments that "significantly limits [the claimant's] physical or mental ability to do basic work

activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in

20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the

claimant must be found disabled regardless of his age, education, or work experience.  Id.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of

the listed impairments, the Commissioner must review the claimant's residual functional

capacity ("RFC") to determine if the claimant is able to do work he or she has done in the past,

i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or

she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the

Commissioner must decide if the claimant's RFC, age, education, and work experience permit

the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other

work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps

except the final one — that is, proving that there is other work the claimant can perform.  See

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).  "If the claimant satisfies her

burden of proving the requirements in the first four steps, the burden then shifts to the

[Commissioner] to prove in the fifth step that the claimant is capable of working."  Perez v.

Chater, 77 F.3d 41, 46 (2d Cir. 1996) (citation omitted).

III.   <u>DISCUSSION</u>

White objects to the ALJ's ruling on the grounds that (1) the ALJ failed to properly

evaluate White's credibility; and (2) the ALJ failed to follow the "treating physician rule."  Pl.

Mem. at 7-15.   Had we found that the ALJ had properly applied the treating physician rule, and

thus properly rejected Dr. Gibbs' opinion of White's abilities, we would have concluded that the

ALJ's evaluation of White's credibility should be upheld.   However, as described next, we do

not find that the ALJ properly applied the treating physician rule.

In general, the ALJ must give "more weight to opinions" of the claimant's treating

physician when determining if a claimant is disabled.  <u>See</u> 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2); <u>see also</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (the ALJ must give

"a measure of deference to the medical opinion of a claimant's treating physician") (citation

omitted).   Treating physicians "may bring a unique perspective to the medical evidence that

cannot be obtained from the objective medical findings alone or from reports of individual

examinations, such as consultative examinations."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

An ALJ must accord "controlling weight" to a treating physician's medical opinion as to the

nature and severity of a claimant's impairments if the opinion "is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record."  <u>Id.</u> §§ 404.1527(c)(2), 416.927(c)(2).

Inversely, the opinions of a treating physician "need not be given controlling weight where they

are contradicted by other substantial evidence in the record."  <u>Veino v. Barnhart</u>, 312 F.3d 578,

588 (2d Cir. 2002) (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ

must provide "good reasons" for the weight given to that opinion.  <u>Halloran</u>, 362 F.3d at 32-33

(citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation marks omitted).

When assessing how much weight to give the treating sources opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant evidence.  See 20 C.F.R. §§ 404.1527(c), 416.927(c); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).  Courts "do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [should] continue remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33.

White's treating physician, Dr. Gibbs, filled out a form opining that White was essentially precluded from doing repetitive reaching, handling, fingering, and lifting due to her dizziness and weakness, and had significant limitations, but was not completely precluded, in grasping, turning and twisting objects.  R. 297-98.  Dr. Gibbs opined that White could not continuously sit or stand/walk for more than one hour at a time, and it would be necessary or medically recommended for White not to stand/walk continuously while working.  R. 296-97.  Dr. Gibbs also stated that she could not perform jobs that required her to keep her neck in a constant position, such as looking at a computer screen or down at a desk.  R. 298-99.  Dr. Gibbs believed that White was incapable of tolerating even low work stress and would need to take two

20 minute breaks per hour.  R. 299.  She would likely be absent from work more than three times per month.  R. 300.  The ALJ gave "some weight" to Dr. Gibbs's assessments, R. 28, but gave "[s]ignificant weight" to the findings and opinion of the SSA consultative examiner, Dr. Salon.  R. 28-29.

White argues that the ALJ improperly rejected Dr. Gibbs's findings because the ALJ's "terse analysis" was "insufficient to permit meaningful judicial review."  Pl. Mem. at 7.  While it is a close question, we agree with White.  The ALJ's explanation of why he was accepting the consultative physician's evaluation over Dr. Gibbs's opinion fails to provide any detail or analysis.  Essentially, the ALJ merely states that the limitations described by Dr. Gibbs were "not fully supported by the objective findings in the record."  R. 28.  The ALJ never identifies which objective findings he was relying on.  While the Commissioner marshals evidence in the record that might have supported the ALJ's conclusion, see Def. Mem. at 17-18, this is a task that must be performed by the ALJ in the first instance.  The only further explanation of the ALJ's conclusion is the ALJ's statement that White's "lupus and asthma appear to cause some limitations in [White's] capacity for work but not to the degree described by Dr. Gibbs."  R. 28.  No details are given, however, and it is thus unclear what limitations are being referred to and what portions of the record the ALJ is relying on for this particular conclusion.  Thus, the ALJ fails to comprehensively set forth reasons for the weight assigned to a treating physician's opinion."  Halloran, 362 F.3d at 33.

Accordingly, we must remand this case to allow the ALJ to give an explanation for his conclusion that Dr. Gibbs's opinion should not be given controlling weight.

IV.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 19) is denied, and White's motion for judgment on the pleadings (Docket # 10) is

granted. The case is remanded for further proceedings consistent with this Opinion and Order.

Dated: March 27, 2015
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

21